**File Name: 09a0021n.06**
**Filed: January 12, 2009**
NOT RECOMMENDED FOR PUBLICATION

**No. 07-6404**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

EDMUNDO M. ROMBERIO, THERESA
KEIR, MICHELLE LYNN WASHINGTON,
KAREN M. GATELY, THOMAS ROCCO,
THOMAS P. DAVIS, and MARVINA
JENKINS, individually and on behalf of all
others similarly situated,

     **Plaintiffs-Appellees,**

v.                                                                     ON APPEAL FROM THE UNITED
                                                                       STATES DISTRICT COURT FOR THE
**UNUMPROVIDENT CORPORATION,**              EASTERN DISTRICT OF TENNESSEE
ERISA Benefit Denial Actions,                          AT CHATTANOOGA

     **Defendant-Appellant.**

                                               /

**BEFORE:** CLAY and GRIFFIN, Circuit Judges; and STAFFORD, District
                Judge.[*]

     **STAFFORD, District Judge.**

     With leave of this court, the defendant-appellant, UnumProvident Corporation

---

    [*] The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

("Unum"), appeals from the district court's interlocutory order certifying the plaintiffs' breach-of-fiduciary-duty action as a class action. We now **REVERSE**.

## BACKGROUND

The case was begun when fifteen individual claimants filed seven class actions in six federal district courts[1] located in six different circuits.[2] The plaintiffs sued Unum, six of Unum's insuring subsidiaries,[3] and two of Unum's corporate officers, asserting breach-of-fiduciary-duty claims under section 503(a)(3) of the Employment Retirement Security Act of 1974 ("ERISA"). 29 U.S.C. § 1132(a)(3). With one exception, the plaintiffs were covered by group long-term disability insurance policies purchased by their individual employers either from Unum or one of its subsidiaries.[4] Some of the plaintiffs claimed that they were wrongfully denied long-term disability benefits; others claimed that their long-term disability benefits were wrongfully terminated.

In 2003, the cases were consolidated in the Eastern District of Tennessee by the

---

[1] The Southern District of New York, the District of Massachusetts, the Northern District of California, the Eastern District of Pennsylvania, the Eastern District of Tennessee, and the Southern District of Illinois.

[2] The First, Second, Third, Sixth, Seventh, and Ninth Circuits.

[3] The insuring subsidiaries are The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, First Unum Life Insurance Company, Unum Life Insurance Company of America, and Colonial Life & Accident Insurance Company.

[4] The one exception is Thomas Davis. It is alleged that Davis was insured under a group long-term disability policy issued by The Prudential Insurance Company, thereafter The Hartford, neither of which is alleged to be a subsidiary of Unum.

Judicial Panel on Multidistrict Litigation.  Seven of the plaintiffs thereafter settled their claims, and an eighth plaintiff ultimately received the benefits she was seeking.  Those eight plaintiffs have been dismissed from the action, leaving seven plaintiffs who seek to proceed with this consolidated action.

## A.  The Allegations:

The plaintiffs allege that Unum[5] devised and implemented a corporate-wide scheme to illegally deny or terminate the long-term disability claims of thousands of disabled Americans, all in violation of ERISA.  Specifically, in their Consolidated Amended Class Action Complaint, the plaintiffs allege that Unum engages in the following practices:

> a.  Instituting targets, budgets, or goals for cost-savings to be attained through the denial and termination of claims; the claims do not receive a proper review by a fiduciary and are denied or terminated based upon UnumProvident's financial targets rather than the medical and vocational evidence concerning claimants' disabilities;
>
> b.  Providing financial incentives to in-house physicians who will "rubber stamp" previously made business decisions; the physicians thus ignore their appropriate ethical obligations and overlook strong medical evidence that would ordinarily require a disability claim to be approved.
>
> c.  Implementing of compensation and/or bonus plans that reward Company management for denying or terminating as many claims as possible to meet special financial goals set by the Company.
>
> d.  Authorizing more senior in-house doctors to alter the written reports of other "uncooperative" in-house doctors in order to justify a claim denial or termination;

---

[5]  Unum is appealing on behalf of itself and the other corporate defendants.  We refer to the group of corporate defendants as Unum.

e. Creating secret documents for each claim, at the time that claims are filed, that, upon information and belief, sets [sic] a target date for cutting off future disability payments; these "Duration Management" documents reflect business decisions made by non-medical claims personnel as to when the company believes claim payments should stop in the future; physicians are not involved in creating these secret documents which are kept outside of the claims file and withheld from claimants, their attorneys, and reviewing courts, and are not produced in discovery during litigation;

f. Encouraging a game among the in-house physicians called the practice of "insurance medicine;" these in-house physicians are prompted, encouraged, and pressured into (1) changing their valid medical opinions as to a claimant's disability in order to justify a business-driven claim denial; (2) closing their eyes to numerous sources of medical evidence that support a claimant's disability; (3) remaining quiet about their personal medical opinions that require further analysis, review, testing, and follow up that would reveal the claimant's obvious disability; and (4) putting "canned" statements into their written reports that, on the surface, appear to validate a previous decision by claims personnel to terminate ongoing disability payments to a claimant or to deny a claim in the first instance.

g. Recruiting claims personnel who have a reputation for "closing claims" (cutting off the ongoing monthly benefits of disabled individuals);

h. Designing a system in which claimants who have multiple disabling conditions will never receive an integrated overview as to how all of the disabling conditions combine to disable the claimant; by deliberately fragmenting the claim into a number of pieces and preventing a comprehensive review of individuals with "co-morbid" conditions, the Company ensures that the claimant will not receive a comprehensive and fair review of the claim; and

i. Employing numerous other practices that pressure claims handling personnel into causing claims to be denied or terminated without receiving a proper review.

Allegations regarding the seven plaintiffs who remain in the case include the following:

Theresa Keir worked as a financial systems analyst for a real estate company when she became insured under a group long-term disability policy issued by Unum to her employer. In March of 2000, Keir claimed disability arising out of breast cancer surgeries in her left and right breasts, spinal fusions in her low back, removal of a precancerous ovarian cyst, dermatomyocitis, two herniated discs in her neck, and fibromyalgia. Based on an in-house review of her medical records, Unum denied Keir's claim to disability benefits in December of 2000. On appeal, Unum upheld the adverse benefits decision.

Michelle Lynn Washington was employed as an attorney when she became insured under a group long-term disability policy issued by Unum. On May 29, 1998, Washington claimed disability arising from mitral valve prolapse, iron deficiency, anemia, hypothyroidism, cervical discogenic disease, cervical myofascial pain, L-5 radiculopathy, fibromyalgia, and depression. Unum paid Washington disability benefits for almost three years before terminating those benefits in 2001 based upon an in-house medical review that purportedly revealed that Washington could resume her full-time employment as an attorney. On Washington's appeal, Unum upheld the termination of benefits.

Karen Gately was employed as a registered nurse when she became insured under a group long-term disability policy issued by Unum. Gately claimed disability on or about August 1, 1995, arising from fatigue, loss of balance, joint pain and swelling, short term memory loss, and confusion, all arising from lyme disease. After paying disability benefits to Gately for seventy months, Unum terminated her benefits in November of 2001,

allegedly because her file contained no objective data regarding her "Epstein Barr virus, lyme disease, chronic fatigue, and cognitive dysfunction." On review, Unum upheld its decision to terminated Gately's benefits.

Thomas Rocco was employed by the Canadian Imperial Bank of Commerce when he became insured under a group long-term disability policy issued by Unum. On or about February 2, 2000, Rocco claimed disability arising from symptoms associated with Meniere's disease, chronic obstructive pulmonary disease, diabetes mellitus II, hearing loss, and anxiety disorder. Rocco received disability benefits for approximately nine months before his benefits were terminated in May of 2001. On review, Unum upheld its decision to terminate Rocco's benefits.

Thomas P. Davis was employed as a product safety reporting associate when he became insured under a group long-term disability policy issued by The Prudential Insurance Company, thereafter The Hartford. Davis claimed disability in July of 1991 arising from labyrinth dysfunction, which produced balance and reading disabilities. The Prudential/Hartford paid Davis long-term disability benefits until February of 2001, when Unum—as substituted administrator—terminated his benefits. Those benefits were reinstated by Unum before the plaintiffs filed their Consolidated Amended Class Action Complaint in early 2004. Unum contends that Davis has received all benefits to which he was/is entitled.

Marvina Jenkins was employed as a bank loan officer when she became insured

under a group long-term disability policy issued by Unum. In April of 1999, Jenkins claimed disability arising from cognitive injury due to oxygen deprivation to the brain and anoxic encephalopathy, producing an IQ of 62. Jenkins received disability benefits until September of 2000, when Unum terminated her benefits, claiming that she was fit to return to work. It is not alleged that Jenkins sought review of Unum's decision to terminate her disability benefits.

Edmundo M. Rombeiro was employed as a mechanical technician by a communications company when he became insured under a group long-term disability policy issued by Unum. On or about May 16, 2000, Romberio claimed disability arising from the debilitating effects of diabetes, including permanent diabetic neuropathy, blurred vision, dizziness, severe fatigue, and nerve damage. Unum denied Rombeiro's request for disability benefits, then informed him that coverage under his policy would be terminated. It is not alleged that Rombeiro sought review of Unum's decision. On or about October 29, 2001, Unum terminated Rombeiro's coverage.

In their Consolidated Amended Class Action Complaint, the plaintiffs requested injunctive and declaratory relief pursuant to 29 U.S.C. § 1132(a)(3).[6] In particular, the plaintiffs requested an order directing Unum to (a) cease the offending practices of

_____

[6] ERISA section 1132(a)(3) is a catchall remedial provision that authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

wrongfully denying, terminating, or suspending plan benefits; (b) institute, under appropriate judicial supervision, new procedures that fully comply with ERISA; and (c) provide a full and fair review—by a receiver and/or special master appointed to serve as a neutral claims adjustor—"for all claims for benefits under the plan that have been affected by the offending claims practices and thus wrongly denied." In the alternative, the plaintiffs requested imposition of a constructive trust over any trust assets controlled by Unum.

## B. **Class Certification Proceedings:**

The plaintiffs requested certification of a class defined as follows:

> All plan participants and beneficiaries insured under ERISA[-] governed long-term disability insurance policies/plans issued by UnumProvident and the insuring subsidiaries of UnumProvident throughout the United States who have had a long-term disability claim denied, terminated, or suspended on or after June 30, 1999 by UnumProvident or one or more of its insuring subsidiaries after being subjected to any of the practices alleged in the Complaint.

Unum opposed the motion for class certification, arguing, among other things, that

> (1) the existence of individualized issues on both liability and remedy precludes any finding of the homogeneity and cohesiveness required for certification under Rule 23(b)(2); (2) the immature tort doctrine precludes certification because of the very novelty of this [§ ] 502(a)(3) claim; (3) each class member who believes his or her claim was wrongfully denied has both an economically viable cause of action, and a means of bringing it; (4) any payments of benefits they expect as a result of this case are not plainly incidental to the declaratory and injunctive relief that they claim is the focus of their claims; and (5) the incompatibility between these claims and Rule 23

> certification is highlighted by the defective nature of the class definition

*In re UnumProvident Corp. ERISA Benefits Denial Actions*, 245 F.R.D. 317, 322 (E.D. Tenn. 2007) (internal quotation marks and citation omitted).

The district court conducted a hearing on the plaintiffs' motion for class certification on July 18, 2007. The district court thereafter issued a memorandum opinion, explaining that, among other things, (1) the plaintiffs' proposed class definition is sufficiently definite to determine who is or is not a class member; (2) typicality is present because the plaintiffs' allegations "will involve a determination of whether Unum implemented a uniform, profit-driven scheme to deny all claims based on financial concerns, rather than based on the actual merits of the applications for benefits;" (3) the plaintiffs are representative of the class, all having allegedly been subject to an improper uniform policy of denying claims based on the company's profits; (4) the plaintiffs' counsel are qualified and capable of handling the litigation; and (5) the plaintiffs have satisfied the requirements of Rule 23(b)(2) because the common claim is subject to a single injunctive remedy—namely an injunction to end or ameliorate Unum's alleged unlawful claims review policy. Consistent with its findings and conclusions, the district court certified the class, using the class definition proposed by the plaintiffs.

## **STANDARD OF REVIEW**

This court reviews a district court's grant of class certification for abuse of discretion. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002).

A district court abuses its discretion when it "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 895 (6th Cir. 1996) (internal quotation marks and citation omitted). This court will not find an abuse of discretion unless it has a "definite and firm conviction that the trial court committed a clear error of judgment." *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 613 (6th Cir. 2002) (internal quotation marks and citation omitted). When ruling on a motion for class certification, the district court must exercise its discretion within the framework of Rule 23.

## DISCUSSION

Before certifying a class action, a district court must conduct a "rigorous analysis" into whether the requirements of Rule 23 have been satisfied. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc). Under Rule 23(a), a party seeking class certification must show that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. In addition to the prerequisites of Rule 23(a), a party seeking class certification must satisfy one of the three subsections of Rule 23(b). Here, the plaintiffs have moved for certification under Rule 23(b)(2), which demands a showing that "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

According to Unum, the district court failed in its responsibility to conduct the rigorous analysis required for class certification, failing—in particular—in its analysis of the typicality requirement under Rule 23(a)(2) and the element of cohesiveness under Rule 23(b)(2). Citing *Sprague* and *Reeb v. Ohio Dep't of Rehabilitation and Correction*, 435 F.3d 639 (6th Cir. 2006), Unum contends that, as part of its rigorous analysis, the district court was required to examine the precise nature of the plaintiffs' claims as well as the proof required to establish those claims. *Reeb*, 435 F.3d at 644-45 (explaining that allegations of a "general policy" of discrimination are inadequate to establish entitlement to class certification; instead, "rigorous analysis" requires precise information about the incidents, people involved, motivations, and consequences regarding each of the named plaintiffs' claims); *Sprague*, 133 F.3d at 397-98 (noting that certification was not proper merely because the plaintiffs challenged General Motors' system-wide general policy that changed retirees' health benefits; instead, the district court was required to examine what the plaintiffs would have to prove to establish their individual claims); *see also* Fed. R. Civ. P. 23(c)(1)(B) (requiring a district court, when certifying a class, to define not only the class but also the "class claims, issues, or defenses").

While acknowledging that *Reeb* called for a searching examination of the precise nature of the plaintiffs' claims, the district court suggested that the lessons of *Reeb* were

limited to cases involving generalized claims of employment discrimination. Without explaining why those lessons would be inapplicable in a case involving the denial of disability benefits, the district court declined to perform a rigorous analysis of the plaintiffs' claims, merely stating: "[T]he Court will not need to confront such individual determinations here." The district court's refusal to look more closely at the plaintiffs' claims, and also to the defenses that Unum might raise in response to those claims, is puzzling.

To prevail on a breach-of-fiduciary-duty claim under ERISA, a plaintiff must generally prove that the defendant not only breached its fiduciary duty but also caused harm by that breach. *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995). A causal connection between the alleged breach and the alleged harm is thus a necessary element of an ERISA-participant's breach-of-fiduciary-duty claim. Where, as here, the alleged breach purportedly results in the wrongful denial or termination of a participant's benefits, the existence of a causal link between the breach and the harm is particularly dependant upon the equities of the participant's claim. Absent a showing that benefits were *wrongfully* denied, there can be no causal link between an alleged breach and a denial of benefits; and whether a claim for benefits is *wrongfully* denied depends on a number of factors peculiar to the claimant's case. *See Hein v. FDIC*, 88 F.3d 210, 224 (3d Cir. 1996) (dismissing the plaintiff's breach-of-fiduciary-duty claim, explaining that "[b]ecause [the plaintiff] was not entitled to the benefits in the first place, there is no causal link between the alleged breach

of fiduciary duty by [the defendants] and the denial of benefits to [the plaintiff]").

Here, the plaintiffs have alleged that Unum breached its fiduciary duties by wrongfully denying or terminating disability insurance benefits on the basis of a uniform, profit-driven scheme. Indeed, central to the district court's class certification decision was its conclusion that "the theory of liability asserted by Plaintiffs in this case does not *focus* on individual factors . . . because Plaintiffs have characterized their lawsuit as a challenge to UnumProvident's uniform policies and practices with respect to reviewing claims." Dist. Ct. Order of Certification (emphasis in original). That a uniform scheme is alleged, however, does not mean that a class is easily identified or that a class action is necessarily appropriate.

As requested by the plaintiffs, the district court in this case defined the class to include only those plan participants and beneficiaries whose long-term disability benefits were denied or terminated "after being subjected to any of the practices alleged in the Complaint." The district court rejected Unum's argument that, to determine who belongs in a class so defined, thousands of claim files would have to be examined to see if any of the alleged wrongful practices were employed in any particular case . While recognizing that "[i]t may be necessary for the Court to make some factual inquiry," the district court concluded that the class definition was "sufficiently definite so that it is feasible to determine who is or is not a class member." The district court relied on *Forbush v. J.C. Penney Co, Inc.*, 994 F.2d 1101 (5th Cir. 1993) in reaching its conclusion.

In *Forbush*, a retired employee (Forbush) sought class certification in her lawsuit challenging the mathematical formulae used by J.C. Penney to calculate a retiree's estimated social security payments. The method used to estimate such payments was important because, under the company's retirement plans, the pension benefits due to retirees were offset by the amounts they were expected to receive from the Social Security Administration. Forbush sought to represent all former and current Penney employees "whose pension benefits have been or will be reduced or eliminated as a result of the overestimation of their Social Security benefits." *Id.* at 1103. The various employees included in the class were covered by four different pensions plans; and, during the relevant time period, three different formulae were used to estimate a retiree's social security benefits. The district court denied Forbush's motion for class certification, concluding that "each class member's claim will have to be decided on an individual basis." *Id.* at 1104. In a two to one decision, the Fifth Circuit reversed, stating: "The concerns expressed by [the dissent], as well as the district court, regarding the necessity of individualized determinations are important but not, we believe, dispositive, at least at this stage of the litigation." *Id.* at 1106. The court noted that the class could be divided into sub-classes to resolve any issues arising from the use of three formulae.

Here, the district court's reliance on *Forbush* is unmerited. In *Forbush*, the plaintiff challenged a very specific practice uniformly applied to a discrete, easily-defined group of individuals. Indeed, every retiree in the class had his or her pension benefits calculated by

using one of three mathematical formulae for estimating retirees' social security payments. If the mathematical formula was improper as used for one retiree, it was improper for every other retiree whose benefits were determined by application of that formula.

Unlike the plaintiff in *Forbush*, the plaintiffs in this case challenge a group of loosely-defined practices that were <u>not</u> applied uniformly to a discrete, easily-defined class of individuals. Indeed, the record reveals that Unum pays billions in disability benefits annually, which means that, despite Unum's alleged profit-driven claim review practices, many claimants successfully pass through the process and receive disability benefits as a result. Nor can it be said that all class members whose claims for long-term disability benefits were denied or terminated would have been entitled to benefits but for Unum's use of the alleged improper practices. Some of the denials and/or terminations were no doubt merited for medical reasons. As even a cursory search on Westlaw or Lexis Nexis will illustrate, many individuals who request disability benefits—whether under ERISA or social security—are unable to establish entitlement to those benefits. It follows that a class limited to those persons whose benefits were denied or terminated would necessarily include many individuals whose claims were *properly* denied for medical reasons.[7]

To be sure, the district court did not define the class as including those participants whose disability claims were denied or terminated. The court was more specific, defining

---

[7] Counsel for the plaintiffs conceded at oral argument that a class of persons whose benefits were denied or terminated would necessarily include some individuals whose claims were properly denied for medical reasons.

the class to include those participants whose claims were denied or terminated "after being subjected to any of the practices alleged in the Complaint." Such definition, however, does little to distinguish between the set of individuals whose claims were properly denied for valid medical reasons and the set of individuals whose claims were improperly denied for profit-driven reasons. Indeed, as Unum has correctly argued, the only way to distinguish between the two sets of individuals is to engage in individualized fact-finding, and the need for such individualized fact-finding makes the district court's class definition unsatisfactory. *See John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (noting that "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23"); *Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (explaining that a class definition should be based on objective criteria so that class members may be identified without individualized fact finding); 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.21[3][c] (3d ed. 2007) (explaining that "[a] class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class").

The problem with the class definition, moreover, carries over into problems with typicality. As the court explained in *Sprague*, 133 F.3d at 399: "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." There must be some connection, in other words, between the merits

of each individual claim and the conduct affecting the class. Absent such a connection, there is no basis upon which to fashion class-wide relief. Where a class definition encompasses many individuals who have no claim at all to the relief requested, or where there are defenses unique to the individual claims of the class members, *Beck v. Maximum, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006), the typicality premise is lacking, for—under those circumstances—it cannot be said that a class member who proves his own claim would necessarily prove the claims of other class members.

Relying on a statement taken from Judge Martin's dissenting opinion in *Sprague*, the district court began its discussion of typicality by stating: "The test for typicality . . . is not demanding." *Sprague*, 133 F.3d at 415 (internal quotation marks and citation omitted). The district court went on to state that, while typicality is generally lacking when liability turns on individualized factors, typicality is not lacking in this case because the plaintiffs "characterized their lawsuit as a challenge to UnumProvident's uniform policies and practices with respect to reviewing claims." We find the district court's analysis unpersuasive.

Here, the class members—who worked in different jobs, had different vocational skills, had different impairments, and experienced different disability review procedures managed by different claim representatives—are entitled to relief if, and only if, Unum wrongfully denied or terminated their benefits. That all of the plaintiffs may have been subjected to some or all of Unum's alleged wrongful practices does not eliminate the need

for an individualized assessment as to the ultimate propriety of the benefits decisions affecting each and every class member. Because individualized assessments are necessary, it cannot be said that if a named plaintiff succeeds in establishing Unum's liability for breach of fiduciary duty, "so go the claims of the class." *Sprague*, 133 F.3d at 399. Typicality is thus lacking.

In *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999 (8th Cir. 2004), the plaintiff alleged that an ERISA-plan fiduciary engaged in a practice of first awarding long-term disability benefits to a claimant, then terminating or suspending those benefits without asking for or receiving evidence that the claimant's conditions had changed. Among other things, the plaintiff sought injunctive relief for other claimants affected by the same practice. The district court denied the plaintiff's motion for class certification, finding that the plaintiff could not meet the threshold typicality requirement, given that the propriety of terminating any other claimant's benefits was dependent on the facts of each individual case. The Eighth Circuit affirmed, noting that, even if the plaintiff established a breach causing harm to her, the question of whether a breach caused harm to others remained "a case-by-case determination." *Id.* at 1005; *see also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 137-38 (3d Cir. 2000) (affirming district court's denial of class certification for class of beneficiaries whose benefits were wrongfully delayed because "the issue of liability itself requires an individualized inquiry into the equities of each claim"). Like the plaintiffs in *Parke* and *Holmes*, the plaintiffs in this case

have failed to demonstrate typicality.

Even if the plaintiffs were able to demonstrate typicality, they have not shown that certification under Rule 23(b)(2) is appropriate. That rule provides that a class action may be maintained if Rule 23(a) is satisfied and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A class action under Rule 23(b)(2) is referred to as a "mandatory" class action because class members do not have an automatic right to notice or a right to opt out of the class. The defining characteristic of a mandatory class is "the homogeneity of the interests of the members of the class." *Reeb*, 435 F.3d at 649. Because homogeneity is required, unitary adjudication of the claims is feasible without the devices of notice and opt-out. On the other hand, where individualized determinations are necessary, the homogeneity needed to protect the interests of absent class members is lacking. *Id.*

In response to Unum's argument that a Rule 23(b)(2) class is inappropriate in this case because of the lack of homogeneity, the plaintiffs suggest that the presence of individual issues is immaterial because Rule 23(b)(2), unlike Rule 23(b)(3), contains no *predominance* requirement.[8] They do not address the well-recognized rule that Rule 23(b)(2) classes must be *cohesive*. *See Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000) (explaining that "Rule 23(b)(2) operates under the presumption

---

[8] Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."

that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members"); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) (noting that "[w]hile 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive"). The *Barnes* court recognized two reasons why cohesiveness, or homogeneity, is vital to Rule 23(b)(2) actions:

> First, unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action. Thus, the court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives's claims present different individual issues than the claims of the absent members present. Second, the suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently.

*Id.* (internal quotation marks, ellipses, and citation omitted).

The plaintiffs in this case request, among other things, both imposition of a constructive trust as well as entry of an order requiring Unum "to provide a full and fair review . . . of all claims for benefits under the plan that have been denied." The plaintiffs do not explain how a constructive trust could be imposed without individualized review of every claim that was denied. Nor do they explain how the court could, if it ordered "a full and fair review . . . of all claims for benefits under the plan that have been denied," avoid

exposing Unum to what Unum describes as "a one-way ratchet where [Unum] can lose but never win."  As Unum correctly asserts, Unum would have to provide the very relief requested (i.e., re-review) in order to determine whether any individual was, in the first instance, a class member, and, in the second instance, entitled to relief for an *improper* denial or termination of benefits.  Class certification under the circumstances was an abuse of discretion.

## CONCLUSION

For the foregoing reasons, we will **REVERSE** the district court's order of certification.

**CLAY, Circuit Judge, dissenting.** This case is well-suited for class certification because it alleges a common course of wrongful conduct that warrants injunctive relief for the class as a whole. Today's result, which will require that Plaintiffs raise their claims in a series of individual but related lawsuits, will result in a waste of economic and judicial resources that will do very little to address the alleged system-wide directives and policies of Unum. The majority, with little focus on the deferential standard of review that is required in these matters, has grossly misapplied this Court's holdings in cases such as *Reeb* and *Sprague*, and has failed to apply a number of pertinent cases that support the district court's grant of class certification. For these reasons and others, I would affirm the district court's grant of class certification, and I respectfully dissent.

I.

Before addressing the majority opinion, it would be helpful to briefly review the background of this case and Unum's responsibilities under ERISA. This case originated as a series of cases which were referred to the district court by a Judicial Panel on Multidistrict Litigation. On the basis of papers filed and a hearing held, the panel found that consolidated proceedings were appropriate because (1) the underlying actions involved common allegations that Unum engaged in improper claims handling practices in furtherance of a company-wide effort to reduce costs and inflate revenues; (2) the actions involved common questions of fact; and (3) litigation could be expected to focus on a significant number of common events, defendants, and/or witnesses.

The named plaintiffs in the consolidated case are long-term disability insurance claimants, each of whom alleges that he or she was improperly denied claim benefits by Unum. Collectively, Plaintiffs allege that Unum and its subsidiaries devised and implemented an elaborate scheme to illegally deny or terminate the long-term disability claims of thousands of disabled Americans, and brought this action to "stop [Unum's] illegal and alarming practices and to ensure that past, current, and future victims obtain a full and fair review of their claims." More specifically, Plaintiffs claim that Unum fiduciaries systematically: (1) provide financial incentives to physicians who will 'rubber stamp' previously made business decisions in derogation of medical evidence and their ethical obligations; (2) authorize senior in-house physicians to alter the written reports of "uncooperative" physicians in order to justify a claim denial or termination; (3) deny or terminate claims without proper review by a fiduciary based on financial targets rather than the medical and vocational evidence concerning claimants' disabilities; (4) create 'Duration Management' documents that set target dates for cutting off claims and are withheld from claimants, attorneys, and reviewing courts; and (5) pressure physicians to change their medical opinions as to a claimant's disability in order to justify a business-driven claim denial. Plaintiffs argue that these practices constitute a beach of fiduciary duty under ERISA and the regulations promulgated thereunder.

ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and– (A) for the exclusive

purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan . . . ." 29 U.S.C. § 1104. The "minimum requirements for employee benefit plan procedures" under ERISA prohibit administration of claims procedures in a way that "unduly inhibits or hampers" the processing of claims for benefits. 29 C.F.R. § 2560.503-1(a)-(b)(3).

Interpreting these provisions, this Court has held that ERISA imposes high standards of fiduciary duty upon plan administrators which encompass three components:

> The first is a "duty of loyalty" pursuant to which "all decisions regarding an ERISA plan 'must be made with an eye single to the interests of the participants and beneficiaries.'" The second . . . imposes "an unwavering duty" to act both "as a prudent person would act in a similar situation" and "with single-minded devotion" to those same plan participants and beneficiaries. Finally, an ERISA fiduciary must "'act for the exclusive purpose'" of providing benefits to plan beneficiaries.

*Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995) (internal citations omitted). If a fiduciary fails to meet these standards, he or she may be held personally liable for any losses to the plan that result from his breach of duty. *Id.* (citing 29 U.S.C. § 1109(a)). In

addition, plan members are statutorily authorized to seek injunctive relief to enjoin prohibited practices. *See* 29 U.S.C. § 1132(a) ("A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan . . . .").

If proven, Plaintiffs' allegations of Unum's systemic claims practices would certainly establish a violation of the terms of ERISA.[9] The salient question, therefore, is whether these claims must be brought as individual lawsuits by a series of claimants, or whether the claims can properly be raised under the auspices of a class action.

## II.

Inexplicably, given the nature of this case, the majority offers little analysis of this Court's holdings regarding the propriety of raising "course of conduct" cases as class actions. I will begin with this.

We recently advised that "cases alleging a single course of wrongful conduct are particularly well-suited to class certification . . . ." *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). This proposition has been repeated

---

[9] A fiduciary who issued corporate-wide directives to override or modify medical decisions based on predetermined target dates and financial incentives would plainly not be acting "with an eye single to the interests of" plan participants and "for the exclusive purpose" of providing benefits to plan participants. *See Kuper*, 66 F.3d at 1458.

consistently by this Court. *See Olden v. Lafarge Corp.*, 383 F.3d 495, 508 (6th Cir. 2004) (case suited to class certification because plaintiffs raised common allegations which would allow the court to determine liability for the class as a whole); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (acknowledging an "increasingly insistent need" to certify class actions for lawsuits arising out of a "single course of conduct"); *Senter v. GMC*, 532 F.2d 511, 525 (6th Cir. 1976) (finding that "[l]awsuits alleging class-wide discrimination are particularly well suited for 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to a single injunctive remedy.").

The rationale supporting these holdings is well-justified. In cases alleging a common course of prohibited conduct, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion . . . ." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). In this context, class actions serve to achieve economies of time, effort, and expense. *See In re American Medical Sys.*, 75 F.3d 1069, 1084 (6th Cir. 1996).

Moreover, in cases where the optimum result for any one plaintiff would be more than consumed by the costs, class actions may provide the *only* method of vindicating the rights of individuals who otherwise could not afford the litigation. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980). It is in this light that the Supreme Court observed that a district court's ruling on the class certification issue is often "the most

significant decision rendered in [ ] class-action proceedings" because when it is not economically feasible to obtain relief by filing a multiplicity of individual suits for damages, "aggrieved persons may be without any effective redress unless they may employ the class-action device." *Id.* at 339.

The purposes and benefits of class actions are particularly on point in the instant case. It is not practical or feasible for any one disability claimant to bear the cost of litigating the systematic and corporate-wide claims procedures and directives of a large, national disability provider such as Unum. The costs of conducting discovery regarding these procedures would undoubtedly exceed the damages any one plaintiff could hope to recover, and it would be a waste of economic and judicial resources to engage in duplicitous litigation of these common issues. Moreover, a relatively small award in favor of a given plaintiff would do nothing to address or deter the systemic processes of Unum. In such a case, class certification is the proper and practical way to proceed.

The majority takes issue with the fact that in any given plaintiff's case, individualized issues are present and a detailed review of a plaintiff's disability claim may determine that "the claim [was not] *wrongfully* denied." Slip op. at 12 (emphasis in original). However, if it is proven that Unum engages in systematic and prohibited claims practices, a plaintiff is statutorily entitled to injunctive relief. *See* 29 U.S.C. 1104(a)(1)(A) (fiduciary must discharge his duties for the exclusive purpose of providing benefits to participants and their beneficiaries); 29 U.S.C. § 1132(a) (a civil action may be brought by

a plan participant to enjoin any act or practice which violates any provision of the plan).

Moreover, under the majority's reasoning, class actions would be prohibited in a wide variety of course of conduct cases that litigate issues of general liability before addressing individualized issues and damages. There are many such cases. In a toxic tort action, for example, the first order of business might be to determine that a corporation wrongfully disposed of an environmental toxin and created an environmental hazard. After this issue is resolved, individual plaintiffs would have to prove that the toxin caused injury their individual cases. In such cases, it may ultimately be determined that a given plaintiff's injuries were feigned, negligible or attributable to other sources, but so long as the named plaintiffs and the certified class proffered a cognizable claim of wrongdoing, the absence of damages in connection with one plaintiff's claim does not mean the case was not appropriately tried as a class action. *See, e.g., Sterling*, 855 F.2d at 1197 (affirming class certification and holding that the presence of questions peculiar to each individual member of the class was no bar when liability arose from a single course of conduct).[10] Class certification is equally appropriate here, where Unum's system-wide claims practices and policies are alleged to be common and can be litigated before individualized questions are addressed.

---

[10] Securities fraud and consumer protection cases also frequently address general liability issues before they move to individualized findings. *See, e.g., Mayer v. Mylod*, 988 F.2d 635, 640 (6th Cir. 1993) (in a securities fraud action, class action certification was appropriate even though some investors made money and some lost money, because questions of liability were common to all class members regardless of their level of damages).

Similarly, in Title VII "pattern or practice" cases, courts routinely proceed by examining allegations that a company engaged in a common pattern or practice of discrimination, and approach individualized relief in a separate process. *See Franks v. Bowman Transportation*, 424 U.S. 747, 772 (1975) (establishing the "*Franks* model" where plaintiffs must demonstrate the existence of a discriminatory hiring pattern or practice, and the burden then shifts to the defendants to prove that individuals were not in fact victims of discrimination).[11] In *Cooper v. Federal Reserve Bank*, the Supreme Court observed that "[w]hile a finding of a pattern or practice of discrimination itself justifies an award of prospective relief to the class, additional proceedings are ordinarily required to determine the scope of individual relief for the members of the class." 467 U.S. 867, 875-76 (1984). In such cases, as here, it is not known at the onset of litigation whether an individual plaintiff has suffered discrimination that would warrant individualized relief: the primary and first issue to be addressed is the system-wide misconduct by the defendant.

Affirmative action cases also bear similarities to the instant case. In such cases, courts commonly begin by addressing common questions of liability and then move to questions peculiar to each individual class member. In *Grutter v. Bollinger*, for example,

---

[11] The *Franks* model of litigating pattern or practice cases continues to apply. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 328 (1977) (applying the *Franks* model); *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 358 (U.S. 1995) (citing *Franks* and *Teamsters* with approval); *Reeb v. Ohio Dep't of Rehab and Corr.*, 435 F.3d 639, 658 (6th Cir. 2006) (citing *Teamsters* and *Franks* as authority).

the district court granted class certification to individuals of specified races who were denied admission to the law school, and bifurcated the trial into separate liability and damages phases. 539 U.S. 306, 317 (2003). It goes without saying that any individual class member might not have been admitted to the law school, even in the absence of allegedly prohibited practices of the university. In that case, as here, to establish whether any individual plaintiff was entitled to individual damages, a detailed review of the individual's file would be required. But there, as here, the defendant's wrongful practices, if proven, might justify injunctive relief for the class as a whole and "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Powers*, 501 F.3d at 619.

To be sure, there are "course of conduct" cases that are *not* suited for class certification. The most common of these are cases where: (1) injuries arise from individualized or isolated incidents of wrongdoing that do not apply to the class as a whole; or (2) issues of individual compensatory damages predominate. In *Falcon,* for example, the Supreme Court rejected the plaintiffs' claim that there was a policy of system-wide discrimination because the court found that the plaintiffs improperly generalized the experiences of discrete individuals who were subjected to discriminatory actions. 457 U.S. at 159. The Court explained that "[i]f one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title

VII case would be a potential companywide class action." *Id.* The instant case does not raise the same concerns. Here, Plaintiffs are not using the experiences of the few to establish a system-wide policy; instead, the heart of their claim is that Unum has employed corporate-wide directives that claims must be denied based on financial targets. Any individualized grievances flow from that overarching policy.

Class action designation is also inappropriate in course of conduct cases where issues of individual compensatory damages predominate. In *Reeb*, for example, this Court held that the district court abused its discretion by certifying a class under Rule 23(b)(2) because claims for individual compensatory damages predominated over declaratory or injunctive relief. 435 F.3d at 650-51 (expressing concern that highly individualized damages "counseled strongly" against certifying the class, but acknowledging that it would be appropriate for the plaintiffs to bring the case "in an action under Rule 23(b)(2) for declaratory or injunctive relief . . . .") That is exactly what is presented here: Plaintiffs seek injunctive relief as the primary form of relief, and individualized damages can be addressed at a later stage of the proceedings.

In sum, because this course of conduct case centers upon Unum's common and systematic claims practices, and because a finding of general liability would justify class-wide injunctive relief, class certification is appropriate.

### III.

In discussing the majority's conclusions to the contrary, first and foremost, we must

recognize that this Court is obligated to provide "substantial deference" to a court's decision to grant class action certification inasmuch as a district court possesses the "inherent power to manage and control its own pending litigation." *Reeb*, 435 F.3d at 643. The district court's decision is subject to a "very limited review" and should be reversed only upon a "strong showing that the . . . decision was a clear abuse of discretion." *Olden*, 383 F.3d at 507 (internal citation omitted).

As the majority states, a plaintiff seeking class certification is required to satisfy the prerequisites of Rule 23(a) – numerosity, commonality, typicality, and fair representation – along with the relevant subsection of Rule 23(b), which, in this case, requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" FED R. CIV. P. 23(b)(2).

Defendants concede that the requirements of numerosity and commonality are met, but argue that typicality and cohesiveness are lacking. The majority agrees, and also asserts that Plaintiffs have failed to show "a causal connection between the alleged breach and the alleged harm." Slip. op. at 11-12. I disagree, and will address these issues in turn.

A.

The first contested issue is typicality. To establish this prerequisite, Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). A claim is typical if "it arises

from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *American Med. Sys.*, 75 F.3d at 1082). This Court has explained that "[t]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Sprague v. GMC*, 133 F.3d 388, 399 (1998). For the district court to conclude that the typicality requirement is satisfied, "a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Beattie*, 511 F.3d at 561 (quoting *Senter*, 532 F.2d at 525 n.31).

Here, as discussed above, Plaintiffs' claims are typical because they arise from corporate-wide claims directives and procedures, which constitute a prohibited "course of conduct" and a "common element of fact or law," as required in *Beattie*, 511 F.3d at 561. If Plaintiffs are able to prove that Unum has established corporate practices directing personnel to disregard medical diagnoses to meet predetermined financial targets, those findings advance the claims of all class members and would warrant an injunction prohibiting the illegal practices. Individualized damages may remain, but this does not counsel against class certification.

The majority disagrees, relying upon misguided interpretations of *Reeb* and *Sprague* to support a conclusion that typicality is lacking. The majority cites *Reeb*, 435

F.3d at 644-45, for the proposition that allegations of a "general policy" of discrimination are inadequate to establish entitlement to class certification because courts are required to conduct a rigorous analysis of the "incidents, people involved, motivations and consequences regarding each of the named plaintiffs' claims." Slip. op. at 11. However, the *Reeb* Court's admonition was based upon a finding that there was an abundance of individualized issues of proof and damages present in that case.

The *Reeb* Court relied upon *Falcon*, 457 U.S. 147, for the proposition that resolution of employment discrimination claims would "require proof that particular managers took particular employment actions and that either the managers were motivated by a discriminatory animus or the actions resulted in a disparate impact upon the class." *Reeb*, 435 F.3d at 644. The Court expressed concern that the plaintiffs were using the experiences of the few to allege an "abstract policy" of discrimination, and expressed concern that the discrimination alleged could affect many different aspects of employment, such as hiring, firing, promoting, giving benefits, providing vacation time, or delegating work assignments. *Id.* at 644-45.

In contrast, here, Plaintiffs allege that Unum fiduciaries employ systemic policies and practices that instruct medical and claims personnel to deny claims based on pre-established financial targets. Unlike discriminatory hiring, firing, and promotion practices that turn upon the statements and actions of specific managers to specific employees, Plaintiffs here are challenging specific practices and directives that apply to claims

-34-

procedures across the board.

Moreover, *Reeb* is distinguishable because the *Reeb* Court was particularly concerned with the nature of the damages that were sought. The *Reeb* plaintiffs asserted a wide variety of claims, and requested $2 million in compensatory damages and $3 million in punitive damages. *Id.* at 642. The Court expressed concern that these damages included "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." *Id.* at 646. The Court noted that the plaintiffs sought an injunction but that "they did not specify the conduct they sought to have enjoined." *Id.* at 640. This scenario offers a stark contrast to the present case, where Plaintiffs seek injunctive relief as the primary form of relief and are specific about the policies they seek to enjoin.

Most importantly, perhaps, the *Reeb* Court expressly advised that it would have been appropriate for the *Reeb* plaintiffs to bring the case as a class action under Rule 23(b)(2) for declaratory or injunctive relief. *Id.* at 651 ("We emphasize, however, that this holding does not foreclose all Title VII class actions. Plaintiffs now have the choice of proceeding . . . in an action under Rule 23(b)(2) for declaratory or injunctive relief . . . ."). This is precisely the type of claim that is filed here. In this regard, *Reeb* is not just inapposite; it actually supports Plaintiffs' argument for class certification.

The majority also relies on *Sprague*, 133 F.3d at 397-98, for the proposition that class certification is not proper if the plaintiff can prove his own claim but not prove the

claims of other class members. Slip op. at 16-17. This case, if possible, is even more inapposite. The *Sprague* plaintiffs requested relief for the defendants' violations of ERISA based on a bilateral contract theory and on an estoppel theory, and the Court found that the claims lacked typicality because success on either theory would require individualized proofs. 133 F.3d at 398. Under the bilateral contract theory, the district court would have to consider the a wide variety of documents signed by the plaintiffs; under the estoppel theory, the court would need to determine "what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on the statements to his detriment." *Id.* This Court noted that "because of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment" and concluded that "because each plaintiff's claim depended upon facts and circumstances peculiar to that plaintiff, class-wide relief was not appropriate." *Id.* Here, in contrast, Plaintiffs' claims focus on system-wide policies and directives. This is not a case like *Sprague* that had no common thread of liability. Although individualized *damages* may exist for the class members, this issue can be resolved after issues of general liability and injunctive relief are resolved.

The majority's faulty logic, and its misreading of *Sprague*, is perhaps clearest in the following statement: "That all of the plaintiffs may have been subjected to some or all of Unum's alleged wrongful practices does not eliminate the need for an individualized assessment as to the ultimate propriety of the benefits decisions affecting each and every

class member.  Because individualized assessments are necessary, it cannot be said that if a named plaintiff succeeds in establishing Unum's liability for breach of fiduciary duty, 'so go the claims of the class.'"  Slip op. at 17-18 (quoting *Sprague*, 133 F.3d at 399).  This is perplexing.  If a plaintiff proved that Unum engaged in systemic and illegal claims processing practices that harmed him as well as those similarly situated, he would certainly have proven that injunctive relief was warranted for the class.  Moreover, if the majority's reading were applied across the board and a plaintiff had to *prove* all plaintiffs' claims by proving his own claim, class certification would be precluded in a wide variety of cases, including the toxic tort, Title VII, and affirmative action scenarios discussed above.

The majority reads *Sprague* too broadly.  The statement that "as goes the claim of the named plaintiff, so go the claims of the class," 133 F.3d at 399, stands for the proposition that any one plaintiff, in pursuing his own claims, must *advance the interests* of other class members.  The *Sprague* Court, in the quoted passage, was actually paraphrasing its earlier statement that "[a] necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also *advance the interests* of the class members."  *Id.* (quoting *American Med. Systems*, 75 F.3d at 1082) (emphasis added).  The *Sprague* Court went on to say that "in pursuing their own claims, the named plaintiffs could not *advance the interests* of the entire early retiree class.  Each claim, after all, depended on each individual's particular interactions with GM . . . ."  *Id.*

(emphasis added).

Consequently, *Sprague* does not support the majority's conclusion that typicality is lacking. Instead, it supports the opposite conclusion: because Plaintiffs have established that the litigation of their cases would advance the interests of the class, they satisfy the requirement of typicality.

Perhaps because of the majority's undue focus on generalized admonitions in cases such *Sprague* and *Reeb*, the majority fails to acknowledge that courts have granted class certification in a number of cases involving claims that a corporation engaged in a wrongful practice impacting all class members. In *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 885 (6th Cir. 1997), for example, this court affirmed the district court's class certification decision in case governed by ERISA, over arguments that claims would be subject to varied defenses and arguments that the class members suffered varying levels of injury. This Court explained:

> Though the level of claimed injury may vary throughout the
> class -- a common feature of class actions routinely dealt with
> at a remedial phase -- the basic injury asserted is the same:
> Tecumseh violated the terms of the collective bargaining
> agreements by unilaterally terminating fully-funded lifetime
> benefits. As noted above, those differences that exist --
> including the individual estoppel claims -- can be dealt with

through methods other than denial of class certification, at a

later stage in the proceeding.

*Id.* In that case, we aptly noted that "the plaintiffs' evidence appears to follow a pattern, and the people they claim made the representations are largely the same people." *Id.* at 884. Here too, the evidence of alleged wrongdoing follows pattern; in this case, the alleged pattern is one of uniform and prohibited claims procedures. Plaintiffs' claims, like the claims in *Bittinger* and *Beattie*, satisfy the typicality requirement because they arise "from the same event or practice or course of conduct that give[] rise to the claims of other class members, and . . . are based on the same legal theory." *Beattie*, 511 F.3d at 561.

Although we are at an early stage of the proceedings, it is noteworthy that Plaintiffs provide reason to believe that they could succeed in establishing that Unum's alleged practices exist. Other plaintiffs have succeeded in similar cases involving the same defendants. Recently, in the matter of *Merrick v. Paul Revere*, a district court in Nevada issued an order upholding a jury's award of punitive damages to plaintiffs in a trial involving Defendants in the instant case.[12] *See Merrick v. Paul Revere*, No. 2:00-cv-00731 (D. Nev. filed Nov. 14, 2008). In the district court's findings of fact, the court

---

[12] The defendants in *Merrick* were The Paul Revere Life Insurance Company and UnumProvident Corporation. *Merrick v. Paul Revere*, No. 2:00-cv-00731, slip op. at 1. The court's order explains that in 1996-1997, Provident and Paul Revere merged with Unum to form UnumProvident. UnumProvident then entered into an agreement in which it took over all responsibility for handling Revere claims. *Id.* at 8.

stated that the plaintiff had presented "overwhelming" testimonial and documentary evidence of "the existence of targets and goals to terminate [disability] claims" that were " . . . communicated to claim handling employees by such means as e-mails, and weekly Staff Meetings." Slip op. at 4-5. The court found that "[b]ased on the credible testimony about targets and goals, documents, and the duration of Defendants' misconduct, there is every reason to conclude that Defendants gained well in excess of a billion dollars as a result of their claims handling misconduct." *Id.* at 12.

In another case affirming a jury's award of punitive damages, the Ninth Circuit concluded that evidence existed that the same defendants "employed policies to achieve net termination ratios" and "had a conscious course of conduct firmly grounded in established company policies that disregarded the rights of insureds." *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1014 (9th Cir. 2004).[13] These findings support an argument that Plaintiffs' claims are more than unfounded allegations and that the alleged practices they describe are systemic.[14]

---

[13] The defendants in *Hangarter* were Provident Life and Accident Insurance Company, The Paul Revere Life Insurance Company, and UnumProvident Corporation. 373 F.3d 998.

[14] The claims in *Merrick* and *Hangarter* were raised by individual plaintiffs, but the courts' findings of fact, combined with large punitive damage awards that ranged from $5 to $8 million, indicate that the verdicts sought to target the deliberate and systemic practices of the defendants. *See Merrick*, No. 2:00-cv-00731; *Hangarter*, 373 F.3d 998. The availability of individual suits does not guarantee that the concerns of all potential class members will be protected, particularly when individual plaintiffs may not have the resources to bring a claim. In these circumstances, injunctive relief in a class action context is a particularly appropriate tool.

In sum, here, where the practices alleged are corporate-wide and purportedly affect all class members, the claims satisfy the requirements of typicality. In such a case, there is no sound reason to proceed by requiring individual plaintiffs to advance the claims and try common issues of fact separately and repetitively.

B.

The majority next asserts that the claims do not satisfy the requirements of Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" FED. R. CIV. P. 23(b)(2).

Citing authority from the Third and Seventh Circuits, the majority asserts that there is a "well-recognized rule" that classes certified under Rule 23(b)(2) must be cohesive and homogeneous. Pointing to *Reeb*, 435 F.3d at 649, my colleagues declare that "when individualized determinations are necessary, the homogeneity needed to protect the interests of absent class members is lacking." Slip op. at 19. As discussed above, *Reeb* is not fatal to Plaintiff's case, and there is a long line of cases that establish that individualized issues may be determined after general issues of liability are resolved.[15]

_____

[15] This Court has affirmed that "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Powers*, 501 F.3d at 619. This Court also advised that it is not uncommon for the level of claimed injury to vary throughout the class; this is "a common feature of class actions" that can be dealt with through "methods other than denial of class certification, at a later stage in the proceeding." *Bittinger*,

The majority opinion discusses reasons why "cohesiveness, or homogeneity is vital to Rule 23(b)(2) actions[,]" stating that there is the potential that unnamed class members will be prejudiced by a negative judgment in the class action, and that individual issues may pervade the action, making the suit unmanageable. Slip. op. at 20. But the majority's analysis stalls and does not state why the requirement of cohesiveness is lacking here. This lapse is telling; cohesiveness is plainly present in this case, where Plaintiffs state a common theory of wrongdoing and seek injunctive relief that would benefit class members across the board. *See Beattie*, 511 F.3d at 564 (finding that the proposed class was sufficiently cohesive in a consumer protection claim because the issues in that case were "subject to generalized proof, and thus applicable to the class as a whole" and because such issues "predominate[d] over those issues that [we]re subject only to individualized proof.") (citations omitted).

Moreover, the majority appears to take issue with the relief that is sought. Glossing over the fact that the primary form of relief requested is injunctive, the majority states that Plaintiffs request a constructive trust and an order requiring Unum to provide a full and fair review of claims for benefits that have been denied. My colleagues then conclude that this relief would expose Unum to a "one-way ratchet" where Unum would have to provide re-review of claims to determine if a class member was entitled to relief for an *improper* denial or termination of benefits.

---

123 F.3d at 885.

Plaintiffs seek the following forms of relief:

[1.] Awarding plaintiffs and the Class declaratory relief determining the illegality of the conduct alleged and injunctive relief whereby UnumProvident and its subsidiaries are ordered to immediately cease. . . engaging in the offending practices delineated herein;

[2.] Awarding plaintiffs and the Class equitable relief whereby Unum Provident and the subsidiaries are ordered to institute, under the supervision of the Court, new, national procedures that are in full compliance with ERISA;

[3.] Awarding plaintiffs and the Class equitable relief appointing a receiver and/or special master to serve as a neutral claims adjustor and assume the role of responsibility for responding to, acting upon, and making determinations pertaining to claims by plaintiffs and the Class and to provide a full and fair review, as required by 29 U.S.C. §1133(2) of all claims for benefits under the plan that have been denied;

[4.] In the alternative, awarding plaintiffs and the Class a permanent injunction enjoining [the named defendants] from serving as claim fiduciaries and an the [sic] imposition of a constructive trust over the any [sic] trust assets controlled by [said defendants] [pursuant to] 29 U.S.C. §1109; [and]

[5.] Awarding plaintiffs and the Class other appropriate relief[.]

(J.A. 38.)

As the request for relief indicates, the imposition of a constructive trust is only one alternative form of relief. Plaintiffs also request injunctive and declaratory relief enjoining Unum from engaging in the specified prohibited practices, which are more general forms of relief that apply to the class as a whole.

Moreover, it would be perfectly acceptable for the district court to address individualized damages in a separate proceeding. There are a "number of management tools available to a district court to address any individualized damages issues," such as "bifurcating liability and damage trials, or appointing a magistrate judge or special master to preside over individual damages proceedings." *Beattie*, 511 F.3d at 562. This is not an uncommon practice. "By bifurcating issues like general liability or general causation and

damages, a court can await the outcome of a prior liability trial before deciding how to

provide relief to the individual class members." *Olden*, 383 F.3d at 509 (citations

omitted); *see also* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be

maintained as a class action with respect to particular issues."); *Reeb*, 435 F.3d at 658

(suggesting that bifurcated phases of the class action could help separate issues of class-

wide claims of discrimination from individual employment decisions).[16]  Consequently,

the majority's concerns regarding the form of relief sought are unwarranted.

## C.

Finally, the majority asserts that class certification is inappropriate because, under

*Kuper*, 66 F.3d at 1459, "a causal connection between the alleged breach and the alleged

harm is . . . a necessary element of an ERISA-participant's breach-of-fiduciary-duty

claim."  Slip op. at 12.  The majority reasons that "whether a claim for benefits is

*wrongfully* denied depends on a number of facts peculiar to the claimant's case" and that

"absent a showing that benefits were *wrongfully* denied, there can be no causal link

between an alleged breach and a denial of benefits."  Slip. op. at 12 (emphasis in original).

This analysis is misguided for several reasons.

First, and importantly, the *Kuper* Court did not find that plaintiffs must provide a

---

[16] Insofar as the Defendants claim that an individual may not have a medical condition warranting disability benefits, Unum's records are the most relevant items of proof.  If the refusal of benefits was based on permissible factors, such as the lack of a qualifying medical condition, Unum and its agents know best what those factors are and the extent to which they influenced Unum's decision-making process.  *See Teamsters*, 421 U.S. at 359; *Franks*, 424 U.S. at 772.

"causal connection" that their claims were "wrongfully denied" at the *class certification* stage of proceedings. The district court in *Kuper* had *already granted* class certification to the plaintiffs at an earlier stage of litigation, and was reviewing, *de novo*, the grant of summary judgment in favor of the defendants, after considerable discovery had been conducted, and after other dispositive motions had been decided. 66 F.3d at 1451-52. The Court did not discuss class certification requirements anywhere in its opinion, nor was the Court reviewing the district court's decision with the substantial deference that is required when reviewing class certification.

Second, the *Kuper* Court's discussion of a "causal connection" is taken out of context. In the passage cited by the majority, slip op. at 12, the *Kuper* Court concluded that summary judgment was appropriate because the plaintiffs had not demonstrated a "causal link" between the failure to investigate an investment and the harm suffered by the plan because the plaintiff had not demonstrated that "an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." 66 F.3d at 1459-60. In other words, the *Kuper* plaintiffs had not proven that the defendants' actions were improper, even on a general level. Here, as discussed above, proof that Unum had issued directives that valid medical decisions be disregarded in a quest to meet financial targets would certainly constitute a breach of duty warranting injunctive relief. Consequently, the *Kuper* Court's statements cannot be plausibly offered for the proposition that each plaintiff must demonstrate that his claim was *wrongfully denied* at

the class certification stage of proceedings.[17]

This Court must take care not to confuse issues of general liability with issues of individualized causation and damages. As we have advised:

> Although such generic and individual causation may appear to be inextricably intertwined, the procedural device of the class action permitted the court initially to assess the defendant's potential liability for its conduct without regard to the individual components of each plaintiff's injuries. [ . . . ] The main problem on review stems from a failure to differentiate between the general and the particular. This is an understandably easy trap to fall into . . . . Although many common issues of fact and law will be capable of resolution on a group basis, individual particularized damages still must be proved on an individual basis.

*Sterling*, 855 F.2d at 1200 (affirming grant of class certification in a mass tort class action). Here, by holding that Plaintiffs must establish that their claims were "wrongfully

---

[17] The majority also cites to *Hein v. Fed. Deposit Ins. Corp.*, 88 F.3d 210, 224 (3d Cir. 1996), for the proposition that when a plaintiff is not *wrongfully* denied benefits, no "causal link" is established between the alleged breach of fiduciary duty and the denial of benefits. Slip op. at 12. Similarly, the *Hein* court was addressing a grant of summary judgment and not class certification, and the majority's arguments fail for the same reasons discussed above.

denied" at the class certification stage of proceedings and by denying class certification based on the presence of individualized issues, my colleagues fall into the "trap" of which the *Sterling* Court warned. Because general issues of liability could be resolved for the class as a whole, individualized issues of causation and damages were no bar to class certification in that case, and they should be no bar here.

IV.

In conclusion, the district court's class certification decision should stand even under *de novo* review. But given the deferential standard of review that applies in this case, it is particularly improper for this Court to reverse the district court's judgment. In so doing, my colleagues have misapplied the law of this Court, and have disregarded the valid purposes that a class action serves. For these reasons, I respectfully dissent.